IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | | Criminal No. 1:19-cr-00049-1 |
| | : | |
| Plaintiff, | | |
| | : | |
| vs. | | |
| | : | |
| BLAKE EDWARD COOPER, | | |
| | : | DEFENDANT COOPER'S |
| | | SENTENCING MEMORANDUM |
| Defendant. | : | AND MOTION FOR VARIANCE |

COMES NOW the Defendant, BLAKE EDWARD COOPER, by and through his attorney, F. Montgomery Brown, of the F.M. Brown Law Firm, P.L.L.C., and submits the following Sentencing memorandum and motion for variance.

## TABLE OF CONTENTS

1. OFFENSE CONDUCT .......................................................................................3

2. OFFENSE LEVEL COMPUTATION ...................................................................5

3. ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY ............................6

4. FACTORS UNDER 18 U.S.C. §3553(a) ..................................................6

5. ARGUMENT...........................................................................................8

6. SELECTED NARRATIVES FROM SENTENCING SUPPORT LETTERS ......12

7. MOTION FOR VARIANCE OF DOWNWARD DEPARTURE.........................13

8. REQUESTED SENTENCE.................................................................................28

# TABLE OF AUTHORITIES

Cases:

*District of Columbia v. Heller*, 554 U.S. 570 (2008)......................................................15, 17
Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007).........9, 10
*Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007) ...............................................16
*McDonald v. City of Chicago*, 561 U.S. 742 (2010)...........................................................15
*Rita v. United States*, 551 U.S. 338 (2007)..........................................................................9
*United States v. Adams*, 914 F. 3d 602 (8th Cir. 2019) ......................................................17
*United States v. Altmayer*, 2020 WL 3263678 (8th Cir. 2020)..........................................20
United States v. Booker, 543 U.S. 220, 234, 125 S. Ct. 738, 750, 160 L. Ed. 2d 621
(2005)...............................................................................................................................8, 9
United States v. Haack, 403 F.3d 997, 1002-1003 (8th Cir. 2005) .......................................8
United States v. Riley, 2020 WL 3034843, at* 5 ................................................................23
United States v. Roberson, 517 F. 3d 990 (8th Cir. 2008)...................................................10
United States v. Ruelas–Mendez, 556 F.3d 655, 657 (8th Cir.2009) .................................10

Statutes:

18 U.S.C. § 844(e)...................................................................................................................3
18 U.S.C. § 922(g)(3) ..................................................................................... 3, 5, 13, 14, 28
18 U.S.C. § 922(v) ............................................................................................................... 14
18 U.S.C. § 924(a)(2) ...............................................................................................................3
18 U.S.C. § 3553(a) .............................................................8, 9, 10, 20, 21, 22, 26, 28
18 U.S.C. § 3553(a)(1) ....................................................................................... 6, 8, 9
18 U.S.C. § 3553(a)(2) ........................................................ 8, 9, 10, 11, 22, 24
18 U.S.C. § 3553(a)(3) ............................................................................................ 9
18 U.S.C. § 3553(a)(6)...........................................................................................9, 11
28 U.S.C. § 994(g) ................................................................................................................25

Other Authorities:

USSG §1B1.11 ..........................................................................................................................5
USSG §2K2.1 ...........................................................................................5, 13, 14, 26
USSG §2K2.1(a)(4)(b).................................................................5, 13, 14, 15, 16
USSG §2K2.1(b)(1)(B).............................................................................................................5
USSG §2K2.1(b)(2) ....................................................................................14, 15, 16
USSG §2K2.1(b)(6)(B)..............................................................................5, 20, 21
USSG §3E1.1(a) .......................................................................................................................6
USSG §3E1.1(b) .......................................................................................................................6
USSG §4B1.2(a) and (b)..........................................................................................................28
USSG Chapter 5, Part A ...........................................................................................................6
USSG §5K2.6 ...........................................................................................................26, 27, 28
USSG §5K2.14 .........................................................................................................26, 27, 28
USSG §5K2.17 .........................................................................................................14, 27, 28

## OFFENSE CONDUCT

The Defendant, Blake Edward Cooper, knowingly and unlawfully possessed firearms and ammunition as early as January of 2019 through and including July 30, 2019 in violation of 18 U.S.C. §§922(g)(3) and 924(a)(2). Additionally, the Defendant was charged with Explosive Materials – Willfully Making a Threat, on or about July 30, 2019, in violation of 18 U.S.C. § 844(e). Defendant's house was searched by Law Enforcement Officials on or about July 30, 2019 after "Jane Doe" received texts from the Defendant indicating that he was planning to cause harm to Shelby County Law Enforcement Officials and the state judge in Pottawattamie County to whom his dissolution of marriage case was assigned.  In 2018 Blake sought modification of his child support obligation as his two sons were effectually in his custody 50% of the time.  The modification had been denied.  Blake had appealed the matter to the Iowa Appellate Courts.  No child support contempt proceeding was ongoing.  There was nothing occurring in the district court to occasion a warrant for Blake's arrest or police visitation at his home or loss of his driver's license for failure to pay child support.  To the extent he implied otherwise to Jane Doe, the implication was erroneous or a fantasy.

The search warrant for 16121 Lincoln Avenue, Harlan, Iowa 51537 was executed after "Jane Doe" contacted local law enforcement with her concerns that the Defendant was expressing ideation to create an explosive device that would result in "collateral damage" and attention in the press.  The Defendant allegedly warned "Jane Doe" that by his communicating his plans to her, she would become an accessory.   When law enforcement searched his residence, they found 9 rifles, 5 handguns, 7 shot guns and ammunition, as well as ammonium nitrate (still in a box in Defendant's living room) (EX. C26).  Approximately 12 of these firearms were in Defendant's presence because of his father's untimely death in December of 2018.  The guns were not strewn

about the house.  In Defendant's garage were potassium chloride, potassium chlorate, flash powder, black powder (muzzle loader), a wireless detonator with 3 key fobs, a motherboard with antenna, hobby fuse, 90 electric squibs, a microcomputer timer switch, capacitors, glues, liquid nails, silicon tape and other materials.  These materials could be used in the manufacture of an explosive device.  The "device" could theoretically run the gamut from amusing and recreational firework display to an explosive assembly capable of causing property damage or injury to a person.  The items of themselves do not speak of actual intent of Blake.  Blake was known in his neighborhood for creating fireworks-type explosions on the Fourth of July for enjoyment of his guests.  The ammonium nitrate fertilizer was in the living room of his residence next to a cooler with the other items associated with fireworks and detonations (EX. C26 & C27).  The items in the garage referenced above were NOT found in any stage of assembly or manufacture.  No manufactured "boom" devices were found.

No device delivery component such as shell, casing or other "bomb" container or component was found.  Two partially crimped metal casings in the garage were simply discarded aftermarket mufflers removed as ill-fitting from Blake's Camaro.  In other words, law enforcement did not find any explosive device or bomb – however defined, at Blake's residence, nor any device or bomb in any partial stage of manufacture.

When Blake was interviewed by ATF Special Agent Booth on July 20, 2019, Blake claimed he was angry and said he was just stressed.  Blake admitted using methamphetamine and that trucking had got him started on it. Blake had not altered or attempted to alter the Tech-9 to fully automatic. Blake told Agent Booth that he had inherited a dozen guns when his father passed away including the commemorative Browning .308 retirement gift (Ex. C10). Blake described his familiarity with making back yard explosives.  Blake denied intending to use the ammonium nitrate

to hurt anyone. Blake told Agent Booth that he told Jane Doe of the ideations because he wanted her to leave him alone thinking he was crazy. Blake calmly explained his child support objections and that matter on appeal.  Blake and Special Agent Booth talked at some length about making stuff for the 4th of July entertainment.

The Defendant plead guilty to Count I of the indictment on or about November 8, 2019, with the understanding that Count II would be dismissed at sentencing.

**Offense Level Computation**

The 2018 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

**Count 1: Prohibited Person in Possession of a Firearm**

**Base Offense Level:** The guideline for 18 U.S.C. §§922(g)(3) offenses is found in USSG §2K2.1. That section provides that if the Defendant was a prohibited person at the time that he committed the instant offense, the base offence level is 14 (paragraphs 1, 6, and 19). USSG 2K2.1(a)(4)(B) .................................................................................................................**14**

**Specific Offense Characteristics:**  If the offense involved between eight and twenty-four firearms, increase by four levels (paragraphs 6 and 18).  USSG § 2K2.a(b)(1)(B)...................... **+4**

**Specific Offense Characteristics:**  If the defendant used or possessed any firearms or ammunition in connection with another felony offense (Possession of Incendiary or Explosive Device with Intent), increase by four levels (paragraphs 7, 13 through 18 and 45). USSG § 2K2.a(b)(6)(B) ................................................................................................. **+4**

**Victim Related Adjustment:** None...................................................................................**0**

**Adjustment for Role in the Offense:** None.....................................................................**0**

**Adjustment for Obstruction of Justice:** None ...............................................................**0**

**Adjusted Offense Level (Subtotal):** ......................................................................**22**

**Chapter Four Enhancement:** None ......................................................................0

**Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a) ......................................................................**-2**

**Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b) ......................................................................**-1**

**Total Offense Level:** ......................................................................**19**

Defendant has a criminal history score of 0. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of 1. Based on a total offense level of 19 and a criminal history category of 1, the guideline imprisonment range is 30-37 months.

## ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY

The Defendant accepts responsibility for the offense and timely pled guilty. Therefore, he is eligible for the third point Acceptance of Responsibility reduction.

## HISTORY AND CHARACTERISTICS OF THE DFENDANT 18 U.S.C. § 3553(a)(1)

The Defendant was born on November 22, 1968 to the union of Lance and Joelle Cooper. He described a good childhood, absent of any type of neglect or abuse, reported strong family bonds and was very well-cared for by his parents. His father, Lance, died in 2018 from a heart attack, and during his life had no issues with mental health, alcohol or drug problems and had no criminal

history.  His mother, Joelle Cooper, died in 2014 from cancer.  She also was devoid of criminal history and suffered no drug or alcohol problems, nor did she have any mental health issues.

The Defendant has two sisters, Lanna Wilson and Melanie Cooper, aged 52 and 48, respectively.  Lanna lives in Florida, is employed as an office manager, she has no criminal history, no mental health concerns or substance abuse issues.  Melanie lives in Des Moines, Iowa, is an office manager, she has no criminal history, no mental health concerns or substance abuse issues.  Both sisters are in daily contact with the Defendant, aware of his present legal situation and remain supportive of the Defendant.  Sister Melanie reports that the Defendant's methamphetamine use escalated tremendously after the death of their father, and does not believe that the Defendant is dangerous or violent when he is not using.  Melanie continues to make the mortgage payments on the Defendant's residence so the property will be available to him once he returns to society.

The Defendant has four children – daughters Kaylee and Sarah, aged 25 and 21, respectively.  Prior to his arrest he shared joint custody of the two boys, Braden, age 13 and Shane, age 10, with his ex-wife, Brenda Cooper.  The Defendant lived in the residence at 1611 Lincoln in Harlan, Iowa, with his eldest daughter, Kaylee, and the two boys.  His children are all healthy and doing well.

The defendant had been involved in a 2 ½ year relationship with "Jane Doe", also known as Tracey Krayneski.  The relationship was healthy and free of abuse, but the defendant was looking for a way to end the relationship prior to his arrest.  There were no children born to this relationship.

Defendant grew up in Denison, Iowa, where he attended Denison High School and maintained a grade point average of 2.16.  After his graduation in 1987 he joined the Iowa National Guard and then the armed service in 1988 and moved to Ft. Knox, Kentucky, where he completed his basic training and became a chemical equipment repairman.  He received an administrative

discharge in lieu of court martial from the armed forces in 1990 after having gone AWOL. Blake has a long history of gainful employment. The Defendant drove a truck for Hedge and Herberg Truck in Big Stone City, South Dakota from 1996 through 2013, and then an owner operator for their company between 2011 and 2019, when he was arrested for the instance offense. The tractor trailer he drove has since been sold by the family.

   The Defendant suffers from no current or past health problems. He has reported no mental health disorders, no suicide attempts, and no gambling addictions. The Defendant began using methamphetamine when he was 22 years old and has used it on and off since then until his arrest in the instant matter. After Blake's father died in late 2018, his use of methamphetamine increased. He claims never to have used while he had visitation with his children, but his use of methamphetamine did cause problems in the relationship with his ex-wife. He would be interested in placement in a facility that has RDAP. The Defendant first used alcohol in high school. As an adult he would consume 6 beers on two occasions per week, but believes that it never caused him any difficulties and does not consider himself to be an alcoholic. The defendant tried marijuana in high school, but did not like it and has not used it since then.

## ARGUMENT & MOTION FOR DOWNWARD VARIANCE

## A SENTENCE OF 24 MONTHS IS A SUFFICIENT BUT NOT GREATER THAN NECESSARY UNDER 18 U.S.C. § 3553(a)(1) & (2)

   The Guidelines are no longer mandatory, *United States v. Booker*, 543 U.S. 220, 234, 125 S. Ct. 738, 750, 160 L. Ed. 2d 621 (2005), but the district court must take them into account. *United States v. Haack*, 403 F.3d 997, 1002-1003 (8th Cir. 2005)(directing the court to first consider the potential Guideline range, then discern whether traditional departure is appropriate under the Guidelines, then consider all the other factors set forth in 18 U.S.C. § 3553(a).

   The USSG are but one factor for the district court to consider in determining the sufficient but

not greater than necessary sentence.  The other factors set forth in Section 3553(a)(1), (a)(3), (a)(6)-(7) include:

1) The nature and circumstances of the offense and history and characteristics of the defendant;
2) The kinds of sentences available;
3) The need to avoid unwarranted sentencing disparities; and
4) The need to provide restitution.

In fashioning a sentence that is "sufficient but not greater than necessary, [the Court must consider] the nature and circumstances of the offense and the history and characteristics of the defendant..." 18 U.S.C. § 3553(a)(1).  Additionally, the Court must consider the need for the sentence imposed, in that it should:  reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  18 U.S.C. § 3553(a)(2).  The district court must also "avoid unwarranted sentencing disparities among defendants with similar records who have been guilty of similar conduct".  18 U.S.C. § 3553(a)(6)

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007). The correct Guideline calculation does not cabin the court in fashioning the most minimally appropriate sentence.  Id. at 50. In the post-*Booker* sentencing regime, the district court "reasoned sentencing judgment rest[s] upon an effort to filter the Guidelines' general advice through Section 3553(a)'s list of factors...." *Rita v. United States*, 551 U.S. 338 (2007). After argument of the parties for appropriate sentence, the court "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by

a party." *Id.* The Court "may not presume that the Guidelines range is reasonable." *Id.* at 596-97.
The Court "must make an individualized assessment based on the facts presented. If he decides
that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and
ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at
597.  In *Gall* the USSC rejected any mathematical formulae and any requirement of "extraordinary
circumstances" to support a sentence outside the Guideline range.  *Gall* at 47-49.

After setting the sentence, the court "must adequately explain the chosen sentence to allow
for meaningful appellate review and to promote the perception of fair sentencing." *Id.* Thus, the
final step in the determination of a defendant's sentence is to apply the factors in § 3553(a).
*Roberson,* 517 F.3d at 993. The court has substantial latitude in determining how much weight to
give each of the 3553(a) factors, *see United States v. Ruelas–Mendez,* 556 F.3d 655, 657 (8th
Cir.2009).

## JUST PUNISHMENT OR ADEQUATE DETERRENCE PURSUANT TO 18 U.S.C. § 3553(a)(2)(A)

A period of incarceration that contemplates Blake's lengthy detention pending trial, plea
and sentencing will serve as adequate general deterrence to the public and protection of society at
large.

## TO AFFORD SPECIFIC DETERRENCE TO DEFENDANT PURSUANT TO 18 U.S.C. § 3553(a)(2)(B)

Blake has been in custody since July 30, 2019.  He has lost his freedom, in-person visitation
with his children, his job, his reputation and brought embarrassment to his family and the good
name of his deceased parents.  The decisions he made to use methamphetamine and make the
threatening  statements  to  his  girlfriend  were  like  altering  with  dramatic  and  traumatic

consequences. He lived in a small town and had a good, but flawed life. Substance abuse, particularly methamphetamine abuse is difficult to extricate one's self from. Pride and excuses get in the way to admitting need for help. The drug tricks the brain into thinking you can handle this. The drug exacerbates character and personality flaws.

## TO PROTECT THE PUBLIC FROM FURTHER CRIMINALITY PURSUANT TO 18 U.S.C. § 3553(a)(2)(C)

Just punishment should focus upon risk of reoffending and rehabilitation. Blake's criminal history is nil. But for his methamphetamine use, it is probable that he would have continued his existence as a law-abiding, hard-working, divorced father. A man quick of wit, love for his children and a penchant for speaking his thoughts out loud.

I the context of his adult life, Blake's messaging to Jane Doe were simply aberrational. While his unlawful use of methamphetamine and possession of firearms was ongoing, abstinence, treatment and firearm prohibition will adequately protect the public from future criminal behavior.

## TO PROVIDE DEFENDANT WITH NEEDED SUBSTANCE ABUSE TREATMENT

Blake has south treatment while detained and desires to participate in treatment options during any stay of additional incarceration. Following appropriate evaluation, the United States Probation Office is more than qualified to prescribe conditions of release to require recommended out-patient or after care and U/A monitoring.

## THE NEED TO AVOID UNWARRANTED DISPARITIES AMONG DEFENDANTS WITH SIMILAR OFFFENSE CONDUCT AND CRIMINAL HISTORY PURSUANT TO 18 U.S.C. § 3553(a)(6)

In part because of the COVID-19 pandemic and associated court delay, Blake has been doing hard county jail time for nearly a year. The global circumstances of his case pose a uniqueness

distinct to Blake. The parties disagree as to how the court should address the unique features of this case in fashioning a sufficient but not greater than necessary sentence. Blake places emphasis on the true fact that while he was a user in possession of firearms, he has no prior criminal record and an assembly of favorable factors such as long-term employment in past and the ability to have gainful employment when released.

## SELECTED NARRATIVES FROM SENTENCING SUPPORT LETTERS

*"Our dad was and is our best friend. We could always trust in telling him all of our darkest secrets and know that he would have our backs at the end of the day. Our dad was the one that would also make us feel like our problems that we thought were so big at the time were actually so small. Although dad was a truck driver he made it to any and every event that he could. He also made up for it by taking us to Wyoming ever year on snowmobile trips or the Lake Okoboji for the weekend."* - Sara Cooper

*"Although he is divorced, he [Blake] is extremely involved in his children's lives. Now that his 2 older girls are grown, he was very committed to his younger boys who are 11 and 13. He has encouraged them to join activities at school and outside of school. He is their #1 cheerleader on the sideline or in the stands for almost every single event. He quit driving over the road to have set run locally so he could be home every night. I know that when my dad passed of an unexpected heart attack it was crushing for all of us. We lost out mom 5 years before and we weren't ready at all for losing him. Unfortunately, Blake was loaded with a lot of burden of dealing with our parent's house, cleaning it out and maintaining it, etc. due to him living the closest. In addition, trying to deal with losing our dad and keeping appearances like he was 'ok' I believe that's what the drug issue stemmed from."* – Melanie Cooper

*"Blake and Dad were very close, he was his only son, so they did all of the father/son things. Dad coached and umpired a lot of the sporting events, taught him to drive, they worked the garden, went fishing, spent many hours working on cars, doing home projects and they also would go pheasant hunting. They would usually go to our cousin's farm and hunt. My dad had a wide range of guns, from rifles, shot-guns & pistols, to a couple of collector guns. A lot of his guns were old, and a couple never fired. He received a gun from United Parcel Service when he retired. Our dad taught all of us the rules & the respect for firearms....When going thru Dad's things our best solution for all of dad's guns was to have Blake keep them until the estate was closed."* - Melanie Cooper May 31, 2020

*"Blake has made mistakes and I know in my heart as well as he does, he is beyond remorseful. He has had 8 months to really sit and think about what choices he made to put him there. To look at this in a realistic way, Blake's life is half over. He has missed out on so much of his grandkid's milestones and his own children's day to day activities, especially his young boys who are 13 and 11 who need him as much as he needs the, I can honestly reassure you, along with Blake that these past 8 months of not feeling the sun shine on his face, to breath in the fresh air and to not be able to play catch or shoot hoops with his boys, he can only come out a better man, friend and father." – Brenda Cooper*

*"Although it seems hard to believe or understand, Blake is a thoughtful, kind person and has always had morality in his actions. I can assure you that though he has had his ups and downs in life, I and many of his friends are convinced that Blake is an asset to all he meets....Blake was always dependable when needed as father figure or as grandpa to his grandkids, he is a role-model to all the children in his life and embraced each of them for their own special skills and potential." - Dr. Mary Cowan*

*"When I heard the news of what happened with Blake and his arrest, I knew it couldn't be correct. He would never jeopardize not being with his children. In conclusion, I believe Blake was being snarky as he was very unhappy in life and was also ending a relationship that went sour. The context was not great to read but knowing Blake and some of the point-blank comments leads me to believe he was trying to get a rise out of people. I don't expect you to understand this, as again, you have to know Blake to understand his personality. It is a tricky one, but nonetheless anyone that knows him admires." - Mandi Johnson*

## MOTION FOR DOWNARD VARIANCE

**The District Court Should Vary Under *Kimbrough* because the Large Capacity Magazine Enhancement Lacks Rational Basis or Otherwise Over-represents Criminal Culpability.**

Defendant's BOL is fixed at 20 and is predicated upon the advisory Guideline for 18 U.S.C. § 922(g)(3) offenses found in USSG §2K2.1. That section provides that if the offense involved a semi-automatic firearm capable of accepting a large capacity magazine, the base offense level is 20 (paragraph 18(b), (c), and (d)). USSG §2K2.1(a)(4)(B)(i)(I). Of the 21 firearms in Defendant's possession, three are classified as "large capacity magazine" capable firearms:

> Ruger pistol Model SR9 9-millimeter (mm) (SN: 337-59408);
> Glock pistol Model 17CGEN4 9-mm (SN: BBRD496);
> Intratec pistol Model TEC9 9-mm (SN: 26628)

(Final PSR ¶ 18)

If Blake had not possessed over-large magazines, his Base Offense Level would have been

14 as the guideline for 18 U.S.C. § 922(g)(3) offenses is found in USSG §2K2.1. Section 2K2.1 provides that if the defendant was a prohibited person at the time that he committed the instant offense, the base offense level is 14. USSG §2K2.1(a)(4)(B).

The firearms and the magazines associated with the Guidelines enhancement in USSG §2K2.1(a)(4)(B)(i)(I) are not illegal to possess under federal law. In addition to a 6-level upward swing from 14 to 20 in BOL, the increase for large capacity magazines makes Blake ineligible for 6-level decrease under U.S.S.G. Section 2K2.1(b)(2) for sporting purpose. The large capacity magazine increase in BOL has a significant advisory range effect event though only three of the firearms qualify and there is no evidence Blake intended to use any of the three firearms with large capacity magazines for any specific unlawful purpose. This 6-level swing radically changes Blake's advisory Guideline range.

None of these guns or their magazines are illegal under federal law. The Glock 17 is so named exactly because it can hold 17 total rounds of ammunitions. Similarly, the Intratec pistol and associated magazines are not prohibited by federal or Iowa law. The USSC created the enhancement for firearms with extended or large-capacity magazines after the passage of the Violent Crime Control Act and Law Enforcement Act of 1984. This Act directed the Commission to provide for enhancements if the semiautomatic firearm was involved in a crime of violence or controlled substance offense. Pub. L. No. 103-322, § 110501, 108 Stat. 1796, 2015 (Sept. 13, 1994). This Congressional directive was implemented by USSG § 5K2.17 upward departure for large or high-capacity magazines. This amendment appears to correspond with Guidelines associated with new offenses under 18 U.S.C. § 922(v). The statutory ban on certain semiautomatic firearms and large capacity magazines was repealed on September 13, 2004. Pub. L. 103-322, § 110105, 108 Stat. 1796, 2000 (Sept. 13, 1994).

Following the lapse of the assault weapons ban, the Commission in 2006 considered whether to retain the enhanced base offense level in § 2K2.1(a)(4). Ultimately, it decided to not just retain the ban, but to broaden its reach from the specific list of firearms in the former 18 U.S.C. § 921(a)(3) to include any "semiautomatic firearm that is capable of accepting a large capacity magazine". The Commission also amended the definition in U.S.S.G. §5K2.17 to require that the magazine be capable of accepting more than 15 rounds. The only reason the Commission gave for retaining inconsistent application as to whether the enhanced base offense levels apply was that it had "received information regarding inconsistent application as to whether the enhanced base offense levels apply…in light of the ban's expiration." Ex. B, USSG, App C, amend. 691 (Nov 1, 2006). The Commission cited no data confirming this assertion was accurate, and it did not explain why it had any bearing on achieving the purposes of sentencing.

The Department of Justice, for its part, recommended that the Commission *not* enhance the base offense levels in USSG § 2K2.1 for firearms capable of accepting large capacity magazines "because of the fact that the statutes no longer criminalize possession, per se" of such weapons. United States Sentencing Commission Public Hearing, Testimony by Richard Hertling, Attorney General Office of Legal Police, Testimony at 27, *available* at https://www.ussc.gov/sites/default/files/0315USSC.pdf. The Department of Justice recommended keeping the departure at 5K2.17 only, and abandoning the increase in the base offense level. The Federal Defenders provided extensive comment demonstrating that the increased base offense levels were contrary to empirical evidence, contrary to congressional intent, and would include ordinary firearms with legitimate uses and little risk of unlawful violence. United States Sentencing Commission Public Hearing, Testimony by John Rhodes, Assistant Federal Public Defender District of Montana, Testimony at 178 et seq., *available* at https//www.ussc.gov/sites/default/files/0315USSC.pdf.

(United States v. Baker, SDI No. 19-CR-00009 Defendant's Sentencing Memorandum pp.6-7 DOC. 49 10/10/19)

The Glock 17 and Ruger 9mm pistol with standard in excess of 15 round capacity are standard pistols available over-the-counter. Their possession, absent other disqualifier such as applicable here, is not prohibited. See *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010). The Intratec hand firearm was not in-of-itself prohibited by law. All three are, as designed, instruments of self-defense or sporting use. The enhancement under USSG §2K2.1(a)(4)(B)(i)(I) and concomitant disqualifier for reduction for sporting use under U.S.S.G. Section 2K2.1(b)(2) are simply not supported by empirical evidence that these firearms are more dangerous than firearms with lesser clip capacities. The application

of USSG §2K2.1(a)(4)(B)(i)(I) in conjunction with the elimination of the reduction under U.S.S.G. Section 2K2.1(b)(2) simply over-state the seriousness of the offense. The court should vary from the advisory Guideline range under the principles of *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007).

**Defendant's Firearms Constitute Otherwise Lawful collection for Sporting Use and Inheritance.**

Like millions of other Americans, Defendant was raised in an environment where possession, lawful use and collection of firearms was part of routine culture. There is absolutely no evidence that Blake possessed the firearm collection in preparation for some kind of "siege". Volumes have been written regarding America's "gun culture".

American attitudes on gun ownership date back to the American Revolutionary War, and find an origin also in the hunting/sporting ethos, and the militia/frontier ethos that draw from the country's early history.[2]

The American hunting/sporting passion comes from a time when the United States was an agrarian, subsistence nation where hunting was a profession for some, an auxiliary source of food for some settlers, and also a deterrence to animal predators. A connection between shooting skills and survival among rural American men was in many cases a necessity and a 'rite of passage' for those entering manhood. Today, hunting survives as a central sentimental component of a gun culture as a way to control animal populations across the country, regardless of modern trends away from subsistence hunting and rural living.[2]

The militia/frontiersman spirit derives from an early American dependence on arms to protect themselves from foreign armies and hostile Native Americans. Survival depended upon everyone being capable of using a weapon. Prior to the American Revolution there was neither budget nor manpower nor government desire to maintain a full-time army. Therefore, the armed citizen-soldier carried the responsibility. Service in militia, including providing one's own ammunition and weapons, was mandatory for all men—just as registering for military service upon turning eighteen is today. Yet, as early as the 1790s, the mandatory universal militia duty gave way to voluntary militia units and a reliance on a regular army. Throughout the 19th century the institution of the civilian militia began to decline.[2]

Closely related to the militia tradition was the frontier tradition with the need for a means of self-protection closely associated with the nineteenth century westward expansion and the American frontier. There remains a powerful central elevation of the gun associated with the hunting/sporting and militia/frontier ethos among the American Gun Culture.[2] Generations of Americans have continued to embrace and glorify it as a living

inheritance—a permanent element of the nation's style and culture.[3] In popular literature, frontier adventure was most famously told by James Fenimore Cooper, who is credited by Petri Liukkonen with creating the archetype of an 18th-century frontiersman through such novels as *The Last of the Mohicans* (1826) and *The Deerslayer* (1840).[4]

https://en.wikipedia.org/wiki/Gun_culture_in_the_United_States

The Second Amendment confers upon American citizens a limited right to possess firearms. *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783 (2008). The majority Court in *Heller* rejected the argument, among others, that the right to bear arms in the Second Amendment was some "odd outlier", as opposed to "widely understood to codify a pre-existing right". *Id.* at 603. The rights conferred under the Second Amendment are subject to qualification. *United States v. Adams*, 914 F. 3d 602 (8th Cir. 2019). Defendant does not suggest otherwise.

As a user of controlled substance Defendant became a prohibited person. Defendant, however, does not stand accused of using any of the firearms in his possession for any unlawful carry or purpose. The prohibition to his possession of firearms, "guns" or "weapons" is a status crime to protect the public. Any attempt to characterize or classify Defendant as a *gun nut* based upon the quantity or quality possessed is simply a pejorative stereotype cast upon gun owners that has no basis in the law or history of the United States. While reasonable minds may disagree as to whether the proliferation of firearms in private possession in the United States is a good public policy, the possession of a dozen or more firearms does not imply factually or legally fanatical or abnormal behavior, or existing threat to the safety of others.

To be exact, only one of Defendant's firearms was an "AR15" type- in the high velocity .223 caliber - the Smith & Wesson rifle Model M&P .223 (SN: SZ03330) (EX. C17). This firearm is not illegal to possess. Seven firearms were ordinary shotguns. Seven firearms were .22 caliber rifles- low caliber rim-fire "plinking", target and small varmint firearms. "Plinking" refers to

informal target shooting done for pleasure typically at non-standard targets such as tin cans, logs, soda bottles, or any other homemade or naturally occurring target. A person engaging in the plinking exercise is colloquially known as a "plinkster".

Of the 21 firearms in Defendant's possession, approximately 12 were inherited by him or placed in his possession by family agreement because of his father's untimely death on December 18, 2018. Defendant was the male heir, had firearms, and lived the closest in proximity to his father. By family agreement his father's guns were taken to Defendant's house. One of the firearms was a gift to Defendant's father from his employer upon retirement- .308 lever action Browning rifle. Three of his father's guns were manufactured at a time when serial numbers were not required. These firearms are as follows: Winchester Model 37A 12-gauge shotgun (manufactured without a serial number); Savage Model 82012-gauge shotgun (manufactured without a serial number); Mossberg rifle Model 142A .22 caliber (manufactured without a serial number). (Final PSR ¶ 18)

In the residence basement and "man cave" area, nine firearms were found in a wooden display gun cabinet (EX. C15 & C19). Another nine firearms were inside a locked gun safe in the basement, including the Smith & Wesson MP15 ("AR15-type") .223 caliber (EX. C17 & C18) . A bolt action rifle in its case was in Blake's bedroom. (Ex. C3) Blake contends he was intending to work on the scope. The gun was not in that location for home protection and a bolt-action rifle is not suited for such use. Blake's father's gifted Browning was in its manufacturer's box laying on his foosball table in the basement. (EX. C10) A 9mm pistol (unloaded) was in a bedroom display case. (Ex. C4) In Blake's bedroom closet top shelf was a Glock 9mm pistol in a Ruger box. (EX. C5 & C6)

**Defendant's Methamphetamine Use and Abuse was a Significant Contributing Factor to His Aberrant Behavior.**

By his own admission in the substance abuse evaluation (EX. D), Blake had (if he ever had) lost control over his methamphetamine use.  His methamphetamine use when alone and on the road exacerbated his angst that he was being treated unfairly financially by the family law system and courts when he was effectively a 50-50 custodial parent.  Such disagreement with the child support rules is not uncommon.  What is uncommon is expressing ideation that some message must be sent to the system and law enforcement responsive for enforcing court orders.  The bottom line is that at the time Blake sent Jane Doe the messages, nothing in particular was specifically occurring in his modification matter.  No court hearings were set.  His ex-wife had not filed a contempt action.  The "Sheriff" was not coming to his house.  The Department of Transportation was not in the process of suspending his license.  The denial of modification was under appeal.  Nothing was actually happening on July 28, 2019 when the messages were sent.  Nothing was happening except Blake's methamphetamine use had increased after his father's death and he was not thinking clearly. It cannot be stated any more simply. A reasonable person could conclude that but for Blake's spiraling usage and effects on his thinking, the messages would not have been sent.

The court is well-versed in the adverse consequences of use of methamphetamine on the behavior and thinking processes of users.  Brevity on this issue is no weakness in the argument. The drug is very addictive and thought-altering.  Methamphetamine users commonly say and do very stupid, irrational stuff.  That is why it is dangerous.  Blake has, is and will pay a heavy price for his abuse. However, with appropriate treatment and counseling and USPO supervisory requirements, the risk of relapse and adverse affects on critical thinking can be effectively mitigated.  Blake will be forever prohibited from possessing firearms. The court can certainly ban

him from possessing mere powders to make home fireworks or any other matter capable of detonating and going boom.  Nothing in the Final PSR even remotely suggests that Blake Edward Cooper will be unable to follow the rules and orders of the court and USPO after his release from prison.

**To the Extent the Number of Firearms Defendant Possessed Poses Concerns, Approximately one-half were the result of His Father's Untimely Death.**

If Blake's father had not died unexpectedly, he would not have possessed approximately 12 more firearms.  While reducing the amount of firearms would not change his BOL (the cut off is 8), the total number of firearms possessed by drug users has occasionally concerned the courts. See *United States v. Altmayer*, 2020 WL 3263678 (8th Cir. 2020).

**The SOC Enhancement under USSG § 2K2.a(b)(6)(B) for Possession of Incendiary Device in Connection With Another Felony Offense over-represents Defendant's Offense Conduct.**

"Relevant conduct" under the Guidelines and the circumstances of the offense under Section 3553(a) are broadly applied to give the court an entire picture of the totality of circumstances regarding a defendant's behavior in conjunction with the offense of conviction. USSG § 2K2.a(b)(6)(B) provides for a two-point Guideline level increase for conduct in connection with another felony offense- in this case the allegation that Blake contemporaneously violation Iowa Code Section 712.6.  Section 712.6 provides:

1. A person who possesses any incendiary or explosive device or material with the intent to use such device or material to commit a public offense shall be guilty of a class "C" felony.

2. a. A person who possesses any incendiary or explosive device or material shall be guilty of an aggravated misdemeanor.

b. This subsection does not apply to a person holding a valid commercial license or user's permit issued pursuant to chapter 101A, provided that the person is acting within the scope of authority granted by the license or permit.

3. A person who, with the intent to intimidate, annoy, or alarm another person, places a simulated explosive or simulated incendiary device in or near an occupied structure as defined in section 702.12, is guilty of a serious misdemeanor.

A SOC such as USSG § 2K2.a(b)(6)(B) need only to be found at sentencing by a preponderance of the evidence. Such a finding does not mean that Blake committed the offense or any lesser included misdemeanor violation of Section 712.6 beyond a reasonable doubt. Blake does not object to this SOC increase and accepts responsibility for decisions he made and the messaging to Jane Doe. He said what he said and the words themselves express an idea or ideation that had an intended affect upon the recipient of his messages. Use of the photograph of the box of fertilizer and associated messaging to Jane Doe is in of itself a "public offense" of Harassment (Iowa Code Section 708.7) or False Report (Iowa Code Section 712.7). Words do matter but their formulation and communication to another do not mean that Blake assemble an explosive device to blow up property, the district judge or law enforcement. Possession of material capable of violating Iowa's fireworks statute does not violate Iowa Code Section 712.6. *State v. Durgin*, 328 N.W.2d 507 (Iowa 1983).

**Consideration of Incarceration During a Viral Pandemic as a Relevant 3553(a) Factor and Downward Variance Ground.**

Because of COVID-19 and necessary system responses thereto, the time Mr. Cooper spends in prison will necessarily be more severe or restrictive than it ordinarily would. The Court should account for the oppressive nature of BOP confinement by varying below the Guidelines range. Specific acknowledgment is given to the following prepared by the Sentencing Resource Counsel for the Federal Public and Community Defenders.

In considering the factors set out in 18 U.S.C. § 3553(a), the Court is entitled to consider the current COVID-19 pandemic in making its decision as to the sufficient but not greater than necessary sentence. The Bureau of Prisons (BOP) represents that it started implementing, evaluating and modifying its operations in response to the COVID-19 pandemic in January 2020[1] even though the World Health Organization didn't declare it a global pandemic until March 11, 2020 and the United States didn't even declare it a national emergency until March 13, 2020.[2]

Section 3553(a)(2)(A) says the Court need consider a sentence "to provide just punishment for the offense." In considering this, the court must look to how Mr. Cooper will be spending his time while incarcerated. At the time of writing this Memorandum, the BOP is in Phase VII.[3] "Every institution" has been completely locked down.[4] Visitations from family and friends are prohibited. [5] Programs have ceased and movement throughout facilities have been suspended.[6] Even though BOP's website claims movement exceptions for showers, laundry, telephone and email access, and commissary, sometimes these most basic activities are not allowed, resulting in a "total

---

[1] Fed. Bureau of Prisons, *Fed. Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII.

[2] Centers for Disease Control and Prevention, *New ICD-10-CM code for the 2019 Novel Coronavirus (COVID-19), April 1, 2020* (June 30, 2020), https://www.cdc.gov/nchs/data/icd/Announcement-New-ICD-code-for-coronavirus-3-18-2020.pdf.

[3] *See Supra* note 1, at Phase VII

[4] *Id.* Some institutions are even placing into solitary confinement that have tested positive for the virus. *See, e.g.*, Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 55 (Declaration of Joanna Perales) (petitioner placed in Special Housing Unit (SHU) after testing positive for COVID-19); Class Action Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc- 2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-4, at 6 (Declaration of Roger Duane Goodwin) (Petitioner in FCI Butner Medium I moved to the SHU after testing positive for COVID-19).

[5] Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 30, 2020).

[6] *Id.*

lockdown" for "almost twenty-four hours a day."[7] These are the conditions Mr. Cooper will be facing. He will be in total lockdown without the ability to communicate with loved ones or engage in rehabilitative or productive programming.

Furthermore, Mr. Cooper is at grave risk of contracting COVID-19. As of June 29, 2020, "there are 1,442 federal inmates and 143 BOP staff who have confirmed positive test results for COVID-19 nationwide . . . there have been 89 federal inmate deaths and 1 BOP staff member death attributed to COVID-19 disease."[8] The fact that Blake is not personally at risk of increased likelihood or infection or death should not be a featured criteria. The fact he will be incarcerated and placed in an environment susceptible to higher risk of infection and reduced opportunity to engage in rehabilitative programming, at least for the indefinite future, is the key point.

"Thus far, the only way to slow the spread of the virus is to practice 'social distancing.'" *United States v. Riley*, 2020 WL 3034843, at *5 (D. Md. June 4, 2020) (internal quotations and citations omitted). Social distancing is particularly difficult in the penal setting, however. *Id.*

---

[7] *Torres,* ECF No. 1, at 8 (Lompoc); *See also, e.g.*, Mem. From B. von Blanckensee, Acting Complex Warden FCC Lompoc, to All Staff at FCC Lompoc (Apr. 17, 2020) ("no phone or computer access"), https://www.fd.org/sites/default/files/covid19/bop_jail_policies_and_information/2020.04-17_-_lompoc_memos1.pdf; *Hallinan,* ECF No. 1-4, at 3-4 (Declaration of Roger Duane Goodwin) ("Our unit [in FCI Butner Medium] remains locked down. . . except for about 1 hour on weekdays, when we are allowed to take a walk outside of our unit."); *Torres,* at 22-28 (describing crowded, unsanitary conditions); *Torres,* at 56 (Declaration of Joanna Perales) ("prisoners were not allowed to shower" and "once [prisoners] run out of soap, they cannot purchase anymore because the commissary is closed"); *id.* at 59-60 (Declaration of Graciela Zavala-Garcia) ("my son was denied all access to telephones, email and commissary" and "my son has not been able to shower or change into clean clothes"); Class Action Complaint, *Wilson v. Ponce,* No. 20-cv- 04451 (C.D. Cal. May 16, 2020), ECF No. 1, at 82-83 (Declaration of Jackeline Vazquez) (describing the crowded and unsanitary living conditions at FCI Terminal Island and declaring that "my brother was told that prisoners would not be able to use phones and computers until further notice"); Emergency Petition for Writ of Habeas Corpus, *Wilson v. Williams,* No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3-4 (Declaration of Kendal Nelson) ("[At FCI Elkton] They are not allowing us to go outside and get fresh air, and we're not allowed into the law library.").

[8] *See Supra* note 5

(internal quotations and citations omitted). "Prisoners have little ability to isolate themselves from the threat posed by the coronavirus." *Id.* (citations omitted) In fact, it is "impossible to achieve in our federal prisons."[9] Inmates lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings.[10] "And, they are not readily able to secure products to protect themselves, such as masks and hand sanitizers. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stop their spread," even with the actions taken by BOP. *Id.* (citations omitted). Even "[t]he Department of Justice has recognized the unique risks posed to inmates and BOP employees from COVID-19." *Id.* at *6.

Rehabilitation is one of the fundamental purposes of sentencing. *See* 18 U.S.C. § 3553(a)(2)(D) ("to provide . . . needed educational or vocational training"). However, this is impossible given the current state of the BOP. Social visits, inmate movement, volunteer visits (including those from religious advisors) have been suspended.[11] Under these operations, Mr.

---

[9] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); *see also* Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited June 30, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

[10] *See, e.g.,* Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 30, 2020) (allowing three showers a week); *Wilson v. Williams*, --- F.Supp.3d ---, 2020 WL 1940882, at *3 (N.D. Ohio Apr. 20, 2020) (acknowledging that soap and disinfectant "can only be so useful in an environment where the inmates are constantly in close proximity to one another. Likewise, the education about hygiene and social distancing [BOP] tout[s] is only effective if the inmates have the supplies and physical space to put such knowledge into practice."); Facility Evaluation: Metropolitan Detention Center COVID-19 Response, *Chunn v. Edge*, No. 20-cv-1590 (E.D.N.Y. Apr. 30, 2020), ECF No. 72-1, at 2 ("Detainees [at MDC Brooklyn] do not have access to adequate cleaning solutions or personal protective equipment."); Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 56 (Declaration of Joanna Perales) (plaintiffs and other individuals at Lompoc "do not have access to hand sanitizer, and are only given one bar of soap each week"); *id.* at 66 (Declaration of Nema Zayed Fears) ("Since the COVID-19 outbreak started, a single mask is the only piece of protective equipment that my father has received. He has had to re-use that mask for weeks."); Emergency Petition for Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3 (Declaration of Kendal Nelson) (describing "unbearabl[ly]" unsanitary conditions).

[11] *See supra* note 5

Cooper will be unable to receive programming and rehabilitative resources, and instead, will be confined in his "assigned cells/quarters."[12] Because of COVID-19, Mr. Cooper will receive no rehabilitation in prison. The Court should vary below the guidelines range or sentence Mr. Cooper to time-served or probation.

The nature and capacity of federal prisons is critical in sentencing considerations as confirmed by Congress when it enacted the Sentencing Reform Act of 1984. "The Commission . . . shall take into count the nature and capacity of the penal, correctional, and other facilities and services available . . . The sentencing guidelines . . . shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons." 28 U.S.C. § 994(g). However, it is not secret that BOP facilities have been, and remain, overcrowded.[13] The current COVID-19 pandemic has resulted in prisons and jails that are more dangerous, inhumane and deadly than ever before and BOP is not equipped to handle such a scenario. Courts have confirmed that "BOP is struggling to handle this crisis within its prison population."[14] The BOP

---

[12] *See supra* note 1, at Phase VII

[13] *See* Fed. Bureau of Prisons, *Fed. Bureau of Prisons Program Fact Sheet* (rev. July 31, 2019) https://www.bop.gov/about/statistics/docs/program_fact_sheet_20191004.pdf; *see also* U.S. Dep't of Justice, *FY2020 Performance Budget Congressional Submission Federal Prison Systems Buildings and Facilities* 3-4, https://www.justice.gov/jmd/page/file/1144631/download; *see also* Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. On Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. 2-4 (2019) (statement of Kathleen Hawk Sawyer), https://docs.house.gov/meetings/JU/JU08/20191017/110089/HHRG-116-JU08-Wstate-SawyerK-20191017.pdf.

[14] *United States v. McIndoo*, ---F.Supp.3d---, 2020 WL 2201970, at *8 (W.D.N.Y. May 6, 2020); *see also* Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 79 (Declaration of Shamsher Samra, M.D.) (recognizing that the alleged conditions at Lompoc "make it virtually impossible to ensure the safety of prisoners who remain housed at the facility if the current course is maintained" and the conditions "practically ensure[ ] that all remaining prisoners will eventually contract COVID-19 unless extraordinary measures are taken now"); Emergency Petition for Writ of Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-3, at 4 (Declaration of Meghan Novisky, PhD) ("To be clear, without drastic intervention, may more incarcerated individuals and staff [at FCI Elkton] will become infected and will face elevated risks for medical complications and mor[tality]."); Mem. in Support of Mot. for Immediate Bail, *Grinis v. Spaulding*, No. 20-cv-10738-GAO (D. Mass Apr. 15, 2020), ECF No. 4-7, at 8 (Declaration of Dr. Joe Goldenson) ("persons currently detained at FMC Devens are at significantly greater risk of contracting COVID-19 than if they were permitted to shelter in place in their home communities").

has exceeded its capacity to care for incarcerated individuals during this COVID-19 pandemic and this Court should not contribute to this overcapacity by incarcerating Mr. Cooper.

Furthermore, there exist mitigating factors which would suggest a departure/variance from the guidelines in that the Defendant stated to this reporter that he was involved in a relationship which he was attempting to end, and in the attempt to end the relationship, sent text messages to and spoke with his then significant other, now identified as the "Jane Doe" who initially reported his activities to law enforcement. The Defendant believed that through spinning the tale of threatened future violence and demonstrating to his significant other his purported emotional instability, she would independently make the decision to leave the relationship, thus freeing him to pursue other interests.

### The Government's Requested Upward Variances Should be Denied.

The government proposes that the court should vary upward variously for Guideline "departure" grounds under U.S.S.G. Sections 2K2.1, Commentary n.7 and n. 11. 5K2.6, 5K2.14, 5K2.17 or simply vary upward to fix a sufficient but not greater than necessary sentence under 18 U.S.C. Section 3553(a).

U.S.S.G. Section 2K2.1, Commentary n.7 provides:

7.    Destructive Devices.—A defendant whose offense involves a destructive device receives both the base offense level from the subsection applicable to a firearm listed in 26 U.S.C. § 5845(a) (e.g., subsection (a)(1), (a)(3), (a)(4)(B), or (a)(5)), and the applicable enhancement under subsection (b)(3). Such devices pose a considerably greater risk to the public welfare than other National Firearms Act weapons.

Offenses involving such devices cover a wide range of offense conduct and involve different degrees of risk to the public welfare depending on the type of destructive device involved and the location or manner in which that destructive device was possessed or transported. For example, a pipe bomb in a populated train station creates a substantially greater risk to the public welfare, and a substantially greater

risk of death or serious bodily injury, than an incendiary device in an isolated area. In a case in which the cumulative result of the increased base offense level and the enhancement under subsection (b)(3) does not adequately capture the seriousness of the offense because of the type of destructive device involved, the risk to the public welfare, or the risk of death or serious bodily injury that the destructive device created, an upward departure may be warranted. See also §§5K2.1 (Death), 5K2.2 (Physical Injury), and 5K2.14 (Public Welfare).

Blake Edward Cooper possessed the means to make a destructive device.  He did not possess

a "device", he had not made a "device" and no "device" was in the process of being manufactured.

The court should decline the invitation for "departure" premised upon "destructive device".

U.S.S.G. Section 5K2.6 provides:

## Weapons and Dangerous Instrumentalities (Policy Statement)

If a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range.  The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others.  The discharge of a firearm might warrant a substantial sentence increase.

U.S.S.G. Section 5K2.14 provides:

## §5K2.14.  Public Welfare (Policy Statement)

If national security, public health, or safety was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense.

U.S.S.G. Section 5K2.17 provides:

## §5K2.17.  Semiautomatic Firearms Capable of Accepting Large Capacity Magazine (Policy Statement)

If the defendant possessed a semiautomatic firearm capable of accepting a large capacity magazine in connection with a crime of violence or controlled substance offense, an upward departure may be warranted.  A "semiautomatic firearm capable of accepting a large capacity magazine" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (1) the firearm had attached to it a magazine or similar device that could accept more

than 15 rounds of ammunition; or (2) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.  The extent of any increase should depend upon the degree to which the nature of the weapon increased the likelihood of death or injury in the circumstances of the particular case.

Section 5K2.6 does not apply as there was no explosive device and none of the guns were prepped or ready to be militarized in some fashion as to make one think they would be used against another person.  Following that same reasoning, §5K2.14 is not applicable because there is nothing to show others were "significantly endangered."

Section 5K2.17 does not apply to the case at hand. This section requires the defendant to have "possessed a semiautomatic firearm capable of accepting a large capacity magazine in connection with a crime of violence or controlled substance offense." USSG §5K2.17. Section 5K2.17 defines "crime of violence" and "controlled substance offense" according to the definitions provided in USSG §4B1.2. *See* USSG §5K2.17, app. note 1. As a crime, 18 USC § 922(g)(3) is not a crime of violence, nor is it a controlled substance offense. *See* USSG §4B1.2 (a) and (b). Thus, an upward departure under §5K2.17 cannot not be administered.

## REQUESTED SENTENCE

By applying the requested variance and considering the applicable 3553(a) factors, Defendant requests that the Court conclude that a sufficient but not greater than necessary sentence is 24 months.

Respectfully submitted,

/s/F. Montgomery Brown
F. MONTGOMERY BROWN   AT0001209
F.M. BROWN LAW FIRM, P.L.L.C.
1001 Office Park Road, Suite 108

West Des Moines, Iowa 50265
Telephone: (515) 225-0101
Facsimile:  (515) 225-3737
Hskrfan@fmbrownlaw.com
ATTORNEY FOR DEFENDANT

Original Filed.

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

CERTIFICATE OF SERVICE

I hereby certify that on _____ day of _July _ 2020, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the following:

Copies to:

Michael Brian Duffy
Assistant United States Attorney
8 South 6th Street, Suite 348
Council Bluffs, Iowa 51501
michael.duffy@USDOJ.GOV